UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cause No. 1:23-CR-41-HAB |
| ) | |
| JAMES J. OLDHAM ) | |
| ) | |

**OPINION AND ORDER**

James J. Oldham ("Oldham"), a suspected drug trafficker, is charged with conspiracy and drug offenses in a three-count superseding federal indictment. (ECF No. 65). These charges stemmed from evidence obtained following execution of a search warrant authorizing the search of three phones that officers seized following Oldham's arrest. At the traffic stop that resulted in his arrest, Oldham unambiguously invoked his right to an attorney. Oldham first moves to suppress statements that he made to officers following his invocation. (ECF No. 51). He also challenges the veracity of the statements contained in the Search Warrant Affidavit authorizing the search of his phones and seeks a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). (*Id.*).

The motion is fully briefed (ECF Nos. 51, 60), and ripe for consideration. Although Oldham invoked his right to an attorney, he also voluntarily waived that right before any interrogation took place. His subsequent statements thus should not be suppressed. And because the Court finds that Oldham has not met his burden for a hearing under *Franks*, the Motion for a *Franks* Hearing will be DENIED. The Court also finds the probable cause determination of the magistrate to be sound and DENIES the Oldham's motion in toto.

**FACTUAL BACKGROUND**

**A. Search Warrant Affidavit**

On January 18, 2023, Carmel Police Department Officer Jeremy Meier ("Officer Meier") submitted a search warrant affidavit to search three cell phones seized from Oldham to search for evidence of drug dealing. (ECF No. 51-1). Based on the affidavit, Hamilton County Superior Court Judge David K. Najjar found sufficient probable cause for the issuance of the warrant. (*Id.*). Because Oldham challenges the sufficiency of the warrant, the Court provides the following summary of the affidavit's contents.

On January 17, 2023, at about 10:30 p.m., Officer Meier pulled Oldham over for speeding in a white 2020 Ford Explorer. (*Id.* at 7). Oldham was the Explorer's sole occupant. (*Id.*). After seeing and smelling marijuana within the vehicle, Officer Meier conducted a search. (*Id.*). He found "plant material that looked and smelled like marijuana…throughout the vehicle." (*Id.*). Officer Meier also found two half-full, pint-sized bottles of prescription cough syrup with the patient information scraped off. (*Id.*). One bottle still had the label as containing promethazine and codeine. (*Id.*). Officer Meier then discovered a third bottle with just a small amount of liquid labeled as hydrocodone clorphen. (*Id.*). The patient information was scraped off this bottle as well. (*Id.*).

Two large suitcases and a backpack were in the back of the vehicle. The first suitcase had a strong odor of marijuana and fabric softener sheets. Within this suitcase, officers found large, vacuum-seal bags along with fabric softener sheets, towels, bedsheets, and sweatshirts. (*Id.*). Stuffed into the pockets of the sweatshirts were many stacks of cash bundled with rubber bands totaling $23,603.[1] (*Id.* at 7-9). Officer Meier also saw "small pieces of plant material" in the first suitcase which appeared to be marijuana. (*Id.* at 8). In the second suitcase, there were more towels,

---

[1] The cash consisted of these denominations: 15 $100 bills; 14 $50 bills; 1,070 $20 bills; 1 $2 bill; and 1 $1 bill. (ECF No. 51-1 at 9).

sheets, vacuum-sealed bags, and more plant material that appeared to be marijuana. (*Id.*). In the backpack were three unused plastic baggies and "small pieces of plant material" that looked and smelled like marijuana. (*Id.* at 7). The plant material tested positive for cannabis. (*Id.* at 8).

Officer Meier then confronted Oldham about the cash and his travels that evening. (*Id.*). Oldham stated that he was traveling from his girlfriend's residence. (*Id.*). Oldham first told Officer Meier that she lived at the "Seasons" and "The Retreat" in Carmel but eventually stated "The Retreat" was the correct location. (*Id.*). He also stated that the cash belonged to his girlfriend, and he was delivering it to her brother at 96th Street and Meridian Street. (*Id.*). According to Oldham, his girlfriend's brother was using the money to buy a box truck for his moving company. (*Id.*). Oldham's girlfriend was a professional dancer and made a lot of "singles." (*Id.*). Oldham explained that she would take up to 10,000 singles to the bank to exchange for larger bills. (*Id.*). After meeting the brother, Oldham planned to return home on Baywood Drive. (*Id.*). Despite discussing his girlfriend and her brother at length, Oldham refused to provide any information including their names and addresses. (*Id.*).

Officer Meier noticed some potential inconsistencies in Oldham's narrative. While Oldham said he planned to meet his girlfriend's brother at 96th Street and Meridian Street, his phone's GPS reflected he was going to a location on River Alder Way. (*Id.*). When confronted by Officer Meier, Oldham said the GPS entry would lead him home. (*Id.*). Yet the GPS entry and Oldham's home on Baywood Drive were on opposite sides of Indianapolis. When Officer Meier informed Oldham of this, he provided no explanation. (*Id.*).

Oldham at first told Officer Meier that the money was from his girlfriend's tax return, but later discussed how she earned money from dancing and exchanging singles for larger bills. (*Id.*). Officer Meier also informed Oldham that the money was suspicious as it was banded with rubber

3

bands rather than official bank packaging. (*Id.*). Officer Meier pointed out that the money was stuffed into sweatshirt packaging.

Officers discovered three cell phones that were the subject of the search warrant. (*Id.* at 9). Based on his training and experience, Officer Meier believed the cash was used to conduct drug trafficking and the phones would contain evidence to that effect. (*Id.*).

**B. Body Camera Footage**

The Court was provided with the body camera from the officers on the scene. At the outset of the stop, Officer Meier approached the vehicle with fellow officer, Shelby Jellison ("Officer Jellison"). (ECF Nos. 59, 62). Oldham had a suspended driver's license and Officer Meier asked him to exit the vehicle. Once outside, Officer Meier placed him in handcuffs and read him his Miranda rights.

Officer Meier then informed Oldham that the car smelled like marijuana with Oldham admitting that he smoked marijuana in the car earlier. While Oldham initially stated that there was no marijuana in the vehicle, he later said there might be a small amount, or a "nugget." He also informed Officer Meier that there was cough syrup and about $10,000 of cash inside a suitcase toward the rear of the vehicle.

As for the cash, Oldham explained that he was taking the suitcase to his girlfriend's brother at a gas station so that he could purchase a box truck. His girlfriend could not make the delivery herself because she had to work. As for the cash's origin, Oldham said that his girlfriend obtained it from her tax refund. Officer Meier told Oldham that he thought January was early to be receiving a refund, but did not delve. Officer Meier also explained that he found it odd to be doing the

4

delivery at almost 11:00 p.m. After this initial encounter, Officer Meier left Oldham with Officer Jellison who took him to her squad car.

Officer Meier then went to search the Explorer. He first found the bottles of prescription cough syrup and a wad of cash in Oldham's wallet. There were apparent pieces of marijuana scattered throughout the vehicle, but Officer Meier did not try to collect all of it for evidence. There was also a can of air freshener in the front passenger seat. Officer Meier then turned to the suitcases located toward the rear of the vehicle.

Within the first suitcase, Officer Meier found items consistent with his description in the Search Warrant Affidavit. Another detail was that the sweatshirts containing the bundled cash were concealed under the towels and sheets within plastic bags. The same items were found in the second suitcase apart from the cash. Officer Meier can be heard saying that the suitcases and money smelled of marijuana and located marijuana shake throughout the suitcases. Officers also located a gun mount, but no gun.

During the search, Officer Jellison had further discussions with Oldham. Oldham said that he received the prescription cough syrup from his grandmother. The labels were apparently scraped off for his protection. And he said that he was going to a gas station at 96th Street and Meridian Street to meet his girlfriend's brother. He then mentioned his girlfriend's career as a professional dancer. Although discussing much about his girlfriend and her brother, Oldham refused to provide Officer Jellison with their names.

Officer Meier then approached Officer Jellison and Sergeant Zach Hasty ("Sergeant Hasty"). Officer Jellison informed the others of what Oldham said to her. She noted that Oldham suggested that his girlfriend made a lot of money from being a dancer and was providing the money

5

to her brother for a box truck. Although at this point it appeared that Officer Meier was more focused on telling Sergeant Hasty what he discovered, Officer Jellison provided that Oldham did not say the cash was from his girlfriend's profession. Officer Meier added that Oldham waffled about whether a pill found in his car belonged to his grandmother or his friend.

Soon after, Officer Jellison returned to speak with Oldham and asked where he was coming from before the stop. Oldham did not respond to the question. He instead asked Officer Jellison if he was being detained to which she responded affirmatively. Oldham then requested an attorney. Officer Jellison acknowledged Oldham's invocation of his rights and reported it to the other officers.

The officers continued to discuss how to handle the rest of the investigation. Officer Jellison expanded on her prior discussion with Oldham. She thought that he was being inconsistent. She also informed the group of Oldham's prior convictions for marijuana possession and a pending case for providing false government identification. Officer Meier later noted that Oldham's GPS location was inconsistent with his proffered destination at 96th Street and Meridian.

Although Sergeant Hasty was aware of Oldham's request for an attorney, he wanted to ask Oldham if he was interested in speaking with a detective. Oldham was in a closed squad car and about three car lengths away when Sergeant Hasty mentioned this to fellow officers. Sergeant Hasty approached the vehicle, opened Oldham's door, and said, "hey sir, I just got a quick question for you." Before Sergeant Hasty could ask his question, Oldham blurted out, "I'll talk to any of you all, just not her, she's being weird to me"—her being Officer Jellison. Sergeant Hasty then confirmed multiple times to Oldham that he could have a lawyer if he wanted one, still without asking if he wanted to speak to a detective. Oldham then reiterated, "Can I talk to you sir? . . .I'll talk to you; I just don't want to talk to her; she is being weird."

6

Sergeant Hasty went over Oldham's potential charges, confirmed that he was being detained, and finally asked Oldham if he was interested in speaking with a detective or working off his charges. Oldham hesitated to speak with a detective, but asked if he could get his charges dropped if he did. Sergeant Hasty said that it depended on what kind of information Oldham could provide and encouraged him to think about it. At no time during this conversation did Oldham ask for an attorney.

Sergeant Hasty then went to discuss the situation with the other officers. He told Officer Meier to get additional information from Oldham and confirmation about the cash's source. Officer Meier expressed confusion because he knew that Oldham had indicated that he did not want to talk. Sergeant Hasty then told Officer Meier that Oldham only did not want to speak with Officer Jellison. Officer Meier field tested the marijuana and returned to speak with Oldham.

Before questioning Oldham, Officer Meier confirmed with Oldham that he only wished to stop speaking with Officer Jellison. Oldham stated explicitly that he wanted to talk to Officer Meier. Oldham then provided more information. He stated that his girlfriend's brother placed the towels and sheets in the suitcase. And he explained that his girlfriend stuffed the cash into Oldham's sweatshirt, but he did not know why. Oldham struggled to explain where his girlfriend resided. He initially said she lived at both the "Seasons" and the "Retreat," but eventually told Officer Meier that she lived across from the "Retreat." As an explanation for how she got so much money, Oldham explained that she danced at multiple establishments and was paid singles which she would exchange at the bank. Oldham did not know exactly where she worked. He also mentioned that she just got her taxes back from her hygiene business.

7

Officer Meier explained to Oldham that his story seemed suspicious, and he had told multiple versions. Officer Meier then asked Oldham if he wanted to speak to a detective and Oldham requested that officers just take him to jail.

## DISCUSSION

**A. Motion to Suppress Statements After Oldham Invoked his Right to an Attorney.**

Oldham argues that any statements made after he invoked his right to counsel with Officer Jellison should be suppressed. Indeed, an accused person "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation" without counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The Government does not dispute that Oldham exercised his right to counsel by requesting an attorney after his encounter with Officer Jellison. In short, the Government contends that Oldham reinitiated conversation with Sergeant Hasty and Officer Meier before any subsequent interrogation took place. The Government thus counters that there is no constitutional violation.

Once a person invokes their right to an attorney, police can no longer interrogate that person. *Id.* This interrogatory bar includes both express questioning and its "functional equivalent." *Edwards*, 451 U.S. at 484-86; *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). The term "interrogation" therefore includes "any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Enoch v. Gramley*, 70 F.3d 1490, 1499 (7th Cir. 1995) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Thus, "the issue is whether a reasonable objective observer would believe that the encounter was 'reasonably likely to elicit an incriminating response from the suspect' and therefore constituted the 'functional

equivalent' of interrogation." *Enoch*, 70 F.3d at 1500 (citing *Killebrew v. Endicott*, 992 F.2d 660, 663 (7th Cir. 1993)). A volunteered statement following non-interrogatory interaction is admissible and not an *Edwards* violation. *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007).

Sergeant Hasty knew that Oldham had invoked his right to an attorney before he went to confront him. And his intent was obvious. Before Sergeant Hasty's interaction with Oldham, he stated, "I'll ask him flat out if he wants to talk to a detective." (ECF No. 59). Although "[Sergeant Hasty's] intent to illicit a response from [Oldham] may suggest that the statement could be a form of interrogation…his intent is not dispositive." *Easley*, 433 F.3d at 973 (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)). "[A]n interrogation does not occur simply because the police knew their actions were likely to result in a suspect volunteering an incriminating response." *Id.* The interaction must be such that an objective observer would believe that the encounter "was reasonably likely to elicit an incriminating response." *Id.* (citing *Innis*, 446 U.S. at 301). Sergeant Hasty's intent carries some weight in the overall analysis, but "the proper focus is 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" *Whitehead v. Cowan*, 263 F.3d 708, 718 (7th Cir. 2001) (quoting *Innis*, 446 U.S. at 301). With this backdrop, the Court finds that Sergeant Hasty and Officer Meier did not interrogate Oldham after he asserted his right to counsel. The body camera makes clear that Oldham voluntarily offered to speak with the male officers.

Oldham was locked in a police car several car lengths away when Sergeant Hasty expressed his intent to other officers. From Oldham's view, Sergeant Hasty could have approached the car and opened the door for several reasons. Sergeant Hasty could have recited why he was being detained, informed Oldham of the evidence that officers discovered, or discussed the possible

9

consequences of his charges—all of which would not be the "functional equivalent" of an interrogation. *Easley*, 433 F.3d at 973-74; *Enoch*, 70 F.3d at 1500. And all that Sergeant Hasty said was "Hey I got a quick question for you[,]" before Oldham interjected. *See Easley*, 433 F.3d at 973 (citing *United States v. Moreno-Flores*, 33 F.3d 1164, 1169-70 (9th Cir. 1994) (fact that police statements to suspect "may have struck a responsive chord" insufficient to find them functional equivalent of interrogation)). Not all interactions between police and a suspect are the functional equivalent of an interrogation. *Id.* at 973-74. To be the functional equivalent of an interrogation, Sergeant Hasty's confrontation of Oldham must include some element of "compelling influences, psychological ploys, or direct questioning." *Id.* at 974. No such influences or ploys were used. And Sergeant Hasty never even asked a question before Oldham specifically requested to speak with male officers on the scene. (ECF No. 59) ("I'll talk to any of you all, just not her, she is being weird to me.").

To that end, it is hard to see how an objective observer would find Sergeant Hasty's interaction as likely to elicit an incriminating response. Saying, "hey I got a quick question for you" is rhetorical. It is not designed to elicit a response at all. Oldham could have waited for Sergeant Hasty's question. Had he, there might well be an *Edwards* violation. But Oldham quickly cut off Sergeant Hasty and explicitly volunteered to speak with the male officers on the scene. From there, Sergeant Hasty still did not ask his question. Instead, Sergeant Hasty confirmed with Oldham that he did not want a lawyer and wanted to speak to police. *See Enoch*, 70 F.3d at 1500 (an officer's repeated expressions about not wanting to elicit incriminating information shows respect for a suspect's rights to be free from interrogation). Sergeant Hasty then asked Oldham to consider whether he wanted to speak with a detective and left him in the patrol car.

Minutes later, Officer Meier, a male officer, went to speak with Oldham. And he too confirmed that Oldham wished to speak with him before asking any substantive questions. Oldham responded he wanted to speak with Officer Meier, but not Officer Jellison. Although Sergeant Hasty knew what he was doing when he approached Oldham the first time, the key question is how an objective observer would view Sergeant Hasty's actual words and expressions. Because Oldham volunteered to speak with officers before any interrogation (or its "functional equivalent") took place, Oldham's subsequent statements were voluntary and thus not an *Edwards* violation. Those statements should not be suppressed.

**B. The *Franks* Standard and Defendant's Offer of Proof**

Oldham also requests a *Franks* hearing based on several alleged misstatements in Officer Meier's Search Warrant Affidavit to search three cell phones found during the stop. He simultaneously moves to suppress the search of the phones. "The Fourth Amendment's strong preference for the use of search warrants calls for probable cause determinations by a 'neutral and detached magistrate' as opposed to 'officer[s] engaged in the often competitive enterprise of ferreting out crime.'" *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "The application for a warrant 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *Id.* "'[A] search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information,' or by omitting material information from the affidavit provided to the issuing judge." *Id.* (quoting *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013)).

11

Ordinarily, a defendant is not entitled to an evidentiary hearing to challenge a facially valid search warrant. But the Supreme Court in *Franks* created a narrow exception to this rule. "'A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.'" *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016). That showing is not limited to false statements but applies to material omissions as well. *Hancock*, 844 F.3d at 708.

Merely to obtain a *Franks* hearing, however, a defendant need not prove the *Franks* violation. "Proof by a preponderance of the evidence is not required until the *Franks* hearing itself." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014). But a hearing is not mandated absent "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). In deciding whether to grant a *Franks* hearing, the Court must only consider the defendant's evidence—not evidence presented by the government to rebut the defendant's evidence. *Glover*, 755 F.3d at 820-21; *McMurtrey*, 704 F.3d 502, 504-05 (7th Cir. 2013).

When law enforcement officials submit a search warrant affidavit, it is presumed that the factual showing they make "will be a truthful showing." *Franks*, 438 U.S. at 164-65 (quotation, citation, and emphasis omitted). To that end, Oldham isolates two pieces of the Search Warrant

12

Affidavit that he believes are material misstatements that cast doubt on the Affidavit's veracity. First, he alleges that Officer Meier misled the issuing judge by mentioning an inconsistency with Oldham's explanation about the cash's origin. Oldham appears to attack Officer Meier's statement: "I then explained that he initially told me the cash was from his girlfriend's tax refund that she just submitted but then changed his story to tell me it was money she earned from dancing and had obtained it from a bank after depositing smaller bills." (ECF No. 51-1 at 7-8).

Second, he alleges that Officer Meier mischaracterized the amount of marijuana found in the Explorer. Indeed, officers collected less than a gram of marijuana from the search. This attack thus appears to focus on Officer Meier's statement that "[d]uring a search of the vehicle, plant material that looked and smelled like marijuana was located throughout the vehicle." (*Id.*). In support of both assertions, Oldham provided the body camera footage of Officer Meier and Sergeant Hasty.

Oldham calls the above statements from the Affidavit false. Yet after reviewing Oldham's Offer of Proof, he is mistaken. The body camera footage patently supports Officer Meier's statements. And, in any event, there is no evidence that Officer Meier included them to deliberately or recklessly mislead the issuing judge. So too, Judge Najjar's probable cause determination remains sound.

### 1. Application of *Franks* Analysis to Oldham's Offer of Proof

It is understood that search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation" *United States v. Ventresca,* 380 U.S. 102, 108 (1965), and so "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). Mindful of this fact, the Seventh Circuit has also instructed that the requirement that a

13

search warrant affidavit be complete does not "require law enforcement to provide every detail of an investigation." *United States v. Taylor*, 63 F.4th 637, 648 (7th Cir. 2023) (citation and quotation omitted).

Starting with the cash's origin. When officers spoke with Oldham the first time, Oldham stated that there was $10,000 in a suitcase which his girlfriend obtained from her tax refund. During the initial interaction, Oldham never mentioned his girlfriend's lucrative dancing career. When Officer Meier asked to speak with Oldham about the cash's origin a second time, Oldham's focus shifted. He tangentially mentioned his girlfriend's tax return but focused on his girlfriend earning a lot of money in "singles"—explaining that she would take the singles and exchange them for larger bills. And Oldham knew the topic of the discussion. He was making these points to explain why his girlfriend had access to so much cash. When Officer Meier asked if his girlfriend obtained so many $20's and $50's by exchanging singles, Oldham said, "yeah pretty much." Although Oldham criticizes Officer Meier for using leading questions, Oldham confirmed this much. Officer Meier's recount of Oldham's explanation is therefore accurate.

Moving on to Officer Meier's characterization of the marijuana found in the Explorer: "During a search of the vehicle, plant material that looked and smelled like marijuana was located throughout the vehicle." (ECF No. 51-1 at 7-8). Indeed, less than a gram of marijuana was recovered. But that does not make Officer Meier's statement untrue. And the video footage makes clear that plant material was scattered throughout the Explorer.

Although minimal marijuana was collected, Officer Meier's recount remains true. Plant material was found near the driver's side door, on the front passenger side floorboard, in the backseat, in both suitcases, and in the backpack. The Court will not read into "plant material" more than what it says. And it does not imply that any large quantities of the material were found. This

14

is all the more true considering the affidavit did not mention packaging and gave no approximate weight given. The most logical interpretation of "plant material" is that of loose and unpackaged material, which implies a small amount—the opposite of Oldham's assertion. And Officer Meier in several other places in the Affidavit states that "*small* pieces of plant material" were discovered which supports the same. Nowhere does Officer Meier suggest that large amounts of the substance were found. Plant material was found throughout the vehicle and Officer Meier did not embellish. Rather, he told an honest version of what officers observed in the Explorer.

Aside from the contents of the Search Warrant Affidavit being true, there is also no evidence that Officer Meier intended to mislead the issuing judge. *See United States v. Woodfork*, 999 F.3d 511, 518-20 (7th Cir. 2021) (Mere negligence will not justify a *Franks* hearing and the defendant must offer "direct evidence of the affiant's state of mind or else circumstantial evidence of a subjective intent to deceive."). In that vein, Officer Meier left out a considerable amount of incriminating details. *See United States v. Hueston*, 90 F.4th 897, 903 (7th Cir. 2024) (When an affiant omits incriminating information that reinforces the affidavit, "[i]t is difficult to discern an intent to mislead—rather than mere carelessness."). Officer Meier did not include that a pistol mount was found under the Explorer's dashboard. Drug traffickers commonly carry firearms to protect their drugs and drug money. Officer Meier did not mention the can of air freshener on the front seat, a common tool for masking the smell of marijuana. Nor did he mention that the cash itself smelled like marijuana or Oldham's criminal history including firearms, marijuana, and narcotics possession as well as false government identification. These incriminating details from the body camera footage are glaringly absent from the Search Warrant Affidavit.

That said, Oldham's preliminary showing is insufficient to warrant a *Franks* hearing. Officer Meier's statements were not false. Nor is there any evidence that Officer Meier acted with

the subjective intent to deceive the issuing judge. And to the extent that Oldham contends that Officer Meier omitted information—such as the weight of the marijuana recovered from the Explorer—he also withheld substantial incriminating information. In large part, it appears that Oldham challenges the wording of the Affidavit. But perfection is not the standard for a search warrant affidavit. Truthfulness and completeness are. When reviewing Oldham's Offer of Proof, Officer Meier's narrative was both.

### 2. Probable Cause

Having found no deliberate falsehoods or material omissions, the Court is left with the four corners of the affidavit. This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

Officer Meier's affidavit (and the inferences the judicial officer may draw from the affidavit)[2] leaves no doubt that the Judge Najjar properly determined probable cause existed to search Oldham's phones for evidence of drug trafficking activities. Although much of the evidence contained in the affidavit is circumstantial, when considering the totality of the circumstances, all the dots between drug trafficking activity, Oldham, and the phones are connected. See *United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021) ("When we evaluate a probable cause finding, we do not view the individual facts in isolation."). The Court is convinced that the information in the warrant affidavit, taken together, was sufficient to cause a reasonably prudent person to believe that a search of Oldham's phones would uncover evidence of drug trafficking activity.

Oldham correctly points out that the existence of a large sum of money by itself is insufficient to support a finding of probable cause. *United States v. Reed*, 443 F.3d 600, 603-04 (7th Cir. 2006). But officers finding around $23,000 in cash is relevant in the totality of the circumstances. *Id.* Whether the money was concealed in a manner typical for drug trafficking is also relevant. *Id.* Although innocent explanations exist for concealing money, drug traffickers commonly conceal their money to avoid the detection of drug sniffing dogs. *Id.* at 604.

So, let's discuss the money. The cash was bundled in $1000 increments using rubber bands as is typical for drug trafficking. It was found stuffed inside sweatshirt pockets and further concealed among towels and bedsheets within a suitcase. Fabric softener sheets and large vacuum-seal bags, tools commonly used by drug traffickers to avoid detection, were also found within the suitcases. When Officer Meier first opened the suitcase there was a strong odor of marijuana and fabric softener sheets. And there were small pieces of marijuana found within the suitcase. The

---

[2] *See United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) ("[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense.").

17

other suitcase contained similar items apart from the money. The Court concedes there may be an innocuous reason for packaging the money this way, but it remains a relevant consideration under the totality of the circumstances. *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (noting that the mere existence of innocent explanations does not necessarily negate probable cause, and finding that probable cause existed where many circumstances of the situation made innocent explanations unlikely and even implausible). And the rest of the circumstances here provide ample support for probable cause.

Officers also found several unused plastic baggies in a backpack which are commonly used to distribute drugs. The vehicle emitted a strong odor of marijuana with small pieces scattered throughout. There were other controlled substances contained in the cough syrup bottles. If all this physical evidence were not enough, Oldham's uncredible story regarding the money and his travels provide the probable cause linchpin.

Officer Meier highlighted the holes of Oldham's story in his Affidavit. First, it was odd that Oldham was delivering concealed money to his girlfriend's brother in the middle of the night. Although Oldham first stated that he had $10,000, the actual amount ended up being about $23,000. Oldham first told Officer Meier that the money was from his girlfriend's tax return, but later used his girlfriend's lucrative dancing career as an explanation for how she obtained so much cash. Despite putting so much onus on his girlfriend, he suspiciously refused to provide her name and struggled to determine where she lived. Nor could he explain why his girlfriend stuffed the cash into random sweatshirt pockets.

Lastly, Oldham told officers that he lived at a residence on Baywood Drive. When asked what the location plugged into his GPS was, he said that it was to take him home after he met his girlfriend's brother. But the address entered on Oldham's GPS was on River Alder Way and on

18

the opposite side of town from Oldham's home on Baywood. Oldham could not explain this discrepancy. Nor can the Court think of an explanation aside from Oldham concealing his true plans for the evening.

From these facts, Judge Najjar had a substantial basis for issuing the search warrant. The physical evidence at least raises eyebrows under the totality of the circumstances. And although there may exist some innocuous explanations, we do not view those facts in isolation. The inconsistencies and vagueness in Oldham's narrative puts the nail in the probable cause coffin and the attendant circumstance put Oldham's innocuous explanation to bed. *See Funches*, 327 F.3d at 587. In totality, there was a fair probability that evidence of drug trafficking would be found on Oldham's cellphones. Oldham's motion to suppress must be DENIED.

## CONCLUSION

Both Defendant's Request for a *Franks* hearing and Motion to Suppress (ECF No. 51) are DENIED. A scheduling order will issue by separate entry.

SO ORDERED on July 30, 2024.

> s/ *Holly A. Brady*
> CHIEF JUDGE HOLLY A. BRADY
> UNITED STATES DISTRICT COURT